IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RONALD WILLIS,<br>                Plaintiff, | CIVIL ACTION |
| v. | |
| NORRISTOWN AREA SCHOOL<br>DISTRICT,<br>                Defendant. | NO. 12-1363 |

DuBois, J.                                                                                                February 20, 2014

**M E M O R A N D U M**

**I.     INTRODUCTION**

This is an employment discrimination case.  Plaintiff, Ronald Willis, alleges that his former employer, Norristown Area School District ("District"), discriminated against him on the basis of his disability in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*., and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. § 951 *et seq*., when it failed to accommodate his disability and terminated his employment.  Presently before the Court is defendant's Motion for Summary Judgment.  For the reasons that follow, the Court grants the Motion.

**II.    BACKGROUND[1]**

In February 1997, plaintiff was hired by the District to work as an art teacher.  Statement of Material Facts ¶ 1 (ECF No. 18-46) [hereinafter Def.'s Material Facts].  In 1999, plaintiff began teaching art at Norristown High School ("NHS").  *Id.* ¶ 2.

In 2004, plaintiff sought counseling due to problems with his marriage.  *Id.* ¶ 3.  In early March 2005, a parent and several students accused plaintiff of using profanity in class and

---

[1] As required on a motion for summary judgment, the facts set forth in this Memorandum are presented in the light most favorable to plaintiff, the non-moving party.

making inappropriate comments to several students.[2]  Def.'s Mot. for Summ. J. Ex. 1.  After conducting an investigation of the allegations, the District suspended plaintiff without pay for two weeks, gave plaintiff an unsatisfactory performance evaluation for the 2004-2005 school year, and directed that plaintiff undergo professional counseling to address his use of inappropriate comments to students.  *Id.*

On March 17, 2005, plaintiff sent an email to, *inter alios*, then-Director of Human Resources Eugene Mayo and NHS Principal Joseph Howell, in which plaintiff requested that he (1) be "allowed to record all [his] classes on [his] cassette recorder," because of the verbal nature of the allegations and, (2) that he be given a mentor "to help [him with] coaching," which he stated he had "been requesting . . . for years."  Def.'s Mot. for Summ. J. Ex. 2.  Eugene Mayo responded by email, stating that the "District cannot permit you to record your classes on your personal recorder," and that, as "a tenured teacher, it is not a practice that the [District] provide you with a mentor."  *Id.*

In May 2005, additional allegations were made against plaintiff.[3]  The District then began an investigation of those incidents.  Def.'s Mot. for Summ. J. Ex. 3.  At the time of the

---

[2] The allegations included (1) using profanity towards students such as "shit," "ass," and "fuck"; (2) telling a student to lick plaintiff's left "nut" and make his right "nut" jealous; (3) making a reference to "not receiving sexual intercourse from wife" during a conversation with a student in which he asked the student if she had a sister; (4) making a reference to a kiss when a student asked for permission to go to the water fountain; (5) asking a student if she saw the snowman [] with the "tits"; (6) telling a male student "the only reason that you would give a female .75 cents is because you want some pu_ _ _"; and (7) calling an African-American female student a "rabbit chaser" because she was walking with a Caucasian male student.  Def.'s Mot. for Summ. J. Ex. 1.

[3] The allegations included (1) reprimanding a student by taking her into a hallway while film from a photography assignment was developing, causing the film to be ruined by overexposure; (2) failing to investigate claims of sexual activity occurring in the classroom; (3) telling his students that one of their classmates had reported the alleged sexual activity, getting the class in trouble; (4) calling a student a "waste of life"; (5) telling a student that his bus was always late because it was a "nigger bus"; and (6) telling black students that they had to eat lunch indoors, but that white students could eat outdoors.  Def.'s Material Facts ¶ 18.

2

investigation, plaintiff denied all of the May 2005 allegations. *Id.* ¶ 19. During his deposition, however, plaintiff admitted that he told a group of black students that they could not go outside during their lunch period, but that white students could go outside. *Id.* ¶ 20. After completing its investigation, the school suspended plaintiff without pay for one day and directed that he undergo additional counseling. *Id.* ¶ 21. In 2005, at plaintiff's request, he was transferred to Stewart Middle School ("Stewart"), also within the District, where he continued to teach art. *Id.* ¶ 23.

In February 2007, plaintiff attempted suicide at his home and was hospitalized from February 17, 2007, to February 18, 2007. *Id.* ¶¶ 26-27. When asked at her deposition if she was aware of plaintiff's suicide attempt, Dr. Rachel Holler, Stewart's principal, testified that she "believe[d] there were rumors that were swirling about at Stewart at some point. But I really couldn't confirm — or that was really what I've heard were rumors about some kind of problems with [plaintiff]." Holler Dep. at 21:25-22:7, 3/15/13, ECF No. 19-30.

In early January 2008, plaintiff was accused of making additional inappropriate comments to several of his students.[4] Def.'s Material Facts ¶ 30. On January 24, 2008, Holler met with plaintiff to discuss the accusations. *Id.* ¶ 32. In a January 28, 2008, letter to plaintiff memorializing the meeting, Holler wrote that plaintiff admitted using the word "damn," telling two female students "I'll freak on you," and telling a male student that he should not be "jerking off" in the bathroom. Def.'s Mot. for Summ. J. Ex. 5. At his deposition, plaintiff admitted the first two allegations, but stated that he told the male student he should not be "jerking around" in the bathroom. Willis Dep. at 81:14-85:2, 3/22/13, ECF No. 18-25. Holler's letter also states that

---

[4] Those accusations included (1) using the word "damn" in class on January 14, 2008; (2) telling two female students, "I'll freak on you"; (3) telling a male student that he should not be "jerking off" in the bathroom; (4) responding "Your Mom," when asked what he looked for in a painting; and (5) using various inappropriate comments, such as "hell," "ass," and "damn." *Id.* ¶ 31.

3

plaintiff, during the January 24, 2008 meeting, said that he "wanted to make a point of record that [he] [is] going through a divorce. [He] stated that [he] stopped seeing [his] therapist and [that he had stopped] taking prescribed medications. [He] stated that [he is] now taking two different medications to help [him] with [his] nerves and to be able to cope with stress." Def.'s Mot. Sum. J. Ex. 5.  After investigating the allegations, the District issued plaintiff a reprimand. Def.'s Material Facts ¶ 35.

On January 31, 2008, plaintiff again met with Holler to discuss more allegations.[5] Def.'s Mot. for Summ. J. Ex. 6.  In a February 1, 2008 letter to plaintiff, memorializing the meeting, Holler states:

> [Y]ou requested some assistance because you said that a lot of your students this trimester are needy and seek attention.  I told you that I would be happy to set up a peer visit so that you can observe other teachers in action with these same students. . . . I told you that we would set-up some focus questions for your visit and discuss them at the conclusion of the visit.

Def.'s Mot. for Summ. J. Ex. 6.[6]  Two subsequent meetings were held at the District offices on February 20, 2008 and March 6, 2008 to discuss the late January allegations.  *Id.* ¶ 43.  During the meetings, plaintiff told District Superintendent Janet Samuels that he was going through a divorce.  *Id.* ¶ 44.  At the conclusion of the meetings, the District suspended plaintiff for two days without pay.  *Id.* ¶ 46.

In late March and early April 2008, several more accusations were made against plaintiff. *Id.* ¶ 47.[7]  On April 2, 2008, Holler delivered to plaintiff a letter describing the March and April

---

[5] Those allegations included (1) telling a student who had not finished an assignment that she could finish at plaintiff's house; (2) touching a female student on the shoulder, possibly reaching for her bra strap; and (3) touching a female student on the middle of her back.  Def.'s Material Facts ¶ 37.

[6] Plaintiff did in fact visit two other classrooms to observe other teachers instructing plaintiff's students.  Def.'s Material Facts ¶ 42.

[7] Those allegations included (1) making a student stand in the corner of the room as a

4

allegations and setting up a meeting to discuss them for the next day, April 3, 2008. *Id.* ¶ 50. Later on April 2, 2008, however, plaintiff checked himself into the Horsham Clinic, where he was hospitalized from April 2, 2008 until April 9, 2008. *Id.* ¶ 51.

After leaving the Horsham Clinic on April 9, 2008, plaintiff did not return to work. *Id.* ¶ 54. Rather, on April 8, 2008, plaintiff filed a claim for long-term disability benefits with Madison National Life Insurance Company ("Madison National"). *Id.* ¶ 55-58; Pl.'s Resp. Ex. 18. On April 18, 2008, plaintiff also applied for a Leave of Absence for Restoration of Health with the District. Def.'s Material Facts ¶ 56. On May 6, 2008, plaintiff's union representative faxed the District a letter in support of plaintiff's application for Leave of Absence for Restoration of Health. The letter, from Dr. Evan Thomas of the Horsham Clinic, states that plaintiff was diagnosed with Major Depressive Disorder and Cognitive Disorder. Pl.'s Resp. Ex. 17. On June 16, 2008, plaintiff's long-term disability claim was granted, effective June 10, 2008. Pl.'s Resp. Ex. 18.

In December 2008, plaintiff's psychiatrist, Dr. Ketankumar Patel, sent Madison National a form stating that plaintiff would be able to return to work at the District on January 1, 2009. Def.'s Material Facts ¶ 62. On the form, in response to the question "What activities should Mr. Willis be engaging in to assist in return to work," Dr. Patel wrote "If possible, an overlap period with current substitute teacher, three days." *Id.* ¶ 63.

Plaintiff returned to work on January 5, 2009. *Id.* ¶ 81. Upon his return, plaintiff was not

---

consequence for sitting on his desk; (2) telling a student in detention that he was a bad person, that he "knew where [the student] came from," and that the student would never earn as much as plaintiff; (3) in response to a student's request to leave a detention, telling a boy, "No, because I have a date with your mother"; (4) telling his students that he "loved" a student who would speak up in class, making the student uncomfortable; (5) telling two female students that he was divorced, and that they should let him know if they saw any "for sale" signs on homes in the area; and (6) telling one female student that she could accompany him in his search for new housing. Def.'s Material Facts ¶ 48.

5

sent to his normal art class, but rather, was assigned by Holler to assist another teacher in supervising Stewart's time-out room, which is used to discipline students. *Id.* ¶ 81. On January 6, 2009, Holler, plaintiff, and others met to discuss the late March and early April 2008 allegations. *Id.* ¶ 82. In the meeting, plaintiff read from a statement he had prepared, responding to several of the allegations[8] and expressing his "ang[er] at the way the school handle[d] [his] investigation." *Id.* When asked at his deposition what angered him about the District's investigation, plaintiff stated that the District included in its investigation students that had not made allegations and that "it should have been students that had allegations." Willis Dep. at 24:21-25:12, 4/18/13, ECF No. 19-32.

After the meeting, Holler wrote that "[plaintiff] continued to use poor judgment in the classroom and in [his] choice of language with students . . . . [S]haring personal matters such as your salary or your marital status are never acceptable conversations to have with middle school students." Def.'s Mot. for Summ. J. Ex. 17. As a result of plaintiff's actions, Holler recommended that plaintiff receive an unsatisfactory review for the 2007-2008 school year and that his employment be terminated. *Id.*

On January 12, 2009, plaintiff attended another hearing with, *inter alios*, Superintendent Samuels. Pl.'s Resp. Ex. 25. In a letter to plaintiff dated January 14, 2009, Samuels concluded that plaintiff's "egregious behavior and unprofessional interactions with students are unbefitting of a [District] employee." *Id.* Samuels decided, "[b]ased upon a careful review of the

---

[8] His responses included (1) "As opposed to placing a child in the hallway unsupervised, yes I placed a student in the corner facing the class standing up"; (2) "As to telling a student he was a bad person, I was missed [sic] quoted. I told him his behavior is bad. I proceed to tell the five students that they will never get to where I am by continuing that behavior"; (3) "[Student] was told 'I love you' and I continue[d] to say, 'because she challenges me and speaks her mind in class'"; (4) "I told the student about the divorce with intentions to confirm my needs for looking [for] another dwelling place"; (5) "In telling [a student] she could come statement [sic] was telling the student she could show me the housing." Pl.'s Resp. Ex. 26.

6

documentation submitted by Dr. Holler, in addition to the progressive discipline actions that have taken place including numerous warnings," that plaintiff be immediately suspended without pay and recommended that the District's Board of Directors terminate plaintiff's employment. *Id.* Plaintiff was terminated on February 14, 2009. Pl.'s Compl. II.I.

On November 3, 2009, plaintiff filed an amended complaint[9] with the Pennsylvania Human Relations Commission ("PHRC"), alleging that, "On or about December 12, 2008, I requested the accommodation of returning to work with the overlap support of the substitute teacher. . . . The [District] denied my request and filled my former position with a long term substitute." Def.'s Mot. for Summ. J. Ex. 18. Plaintiff's amended complaint contained a "personal statement," in which he said that his depression became so severe that he "began losing the capacity to see things in a reality based way and would regularly misinterpret situations and had a loss of appropriate boundaries in my verbal interactions with students." *Id*. Plaintiff went on to state that the District "knew of [his] severe depression but did not consider that as a factor in the complaints made against [him]," and "did not allow [him] to reenter the classroom after my successful treatment." *Id.*

On March 16, 2012, plaintiff filed the Complaint in this case, again alleging that "on or about December 12, 2008, Plaintiff requested the accommodation of returning to work with the overlap support of a substitute teacher. . . . The Defendant denied Plaintiff's request and filled his former position with a long term substitute." Pl.'s Compl. II.F-G.

### III.   Legal Standard

In considering a motion for summary judgment, "the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and

---

[9] Plaintiff's original PHRC complaint was filed June 2, 2009. Pl.'s Compl. III.A. Both the complaint and amended complaint were dual-filed with the EEOC. Pl.'s Compl. III.B.

resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). The party opposing the motion, however, cannot "rely merely upon bare assertions, conclusory allegations or suspicions" to support its claim. *Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982). After examining the evidence of record, a court should grant summary judgment if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

A factual dispute is material when it "might affect the outcome of the suit under the governing law" and genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

## IV.   DISCUSSION

"Discrimination under the ADA encompasses not only adverse actions motivated by prejudice and fear of disabilities, but also includes failing to make reasonable accommodations for a plaintiff's disabilities." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999). In this case, plaintiff argues the District violated the ADA and PHRA both for discriminatorily terminating him and for defendant's failure to accommodate his disability. The Court addresses each in turn.[10]

---

[10] Courts within this Circuit interpret the ADA and PHRA coextensively. *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996). The Court will focus its analysis of disparate treatment on plaintiff's ADA claims; its conclusions on this issue will also cover plaintiff's PHRA claims.

8

### A. Disparate Treatment Claim

Plaintiff argues that the District's reasons for firing him were a pretext for invidious discrimination on the basis of his disability. Pretext cases under the ADA use the familiar burden-shifting framework set out by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under that test, a plaintiff must first prove: "(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination." *Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 580 (3d Cir. 1998). After plaintiff establishes a *prima facie* case,

> the burden shifts to the defendant to state a legitimate, nondiscriminatory reason for its action. If the defendant meets that burden, the presumption of discriminatory action raised by the prima facie case is rebutted. The plaintiff may respond by showing that the defendant's proffered reason was pretextual. To prove that an explanation is pretextual, a plaintiff must cast sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication or allow the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.

*Solomon v. Sch. Dist. of Phil.*, 882 F. Supp. 2d 766, 782 (E.D. Pa. 2012) (quoting *Majewski v. Fischi*, 372 F. App'x 300, 304 (3d Cir. 2010) (internal quotation marks, brackets, and ellipses omitted)).

The Court assumes, *arguendo*, that plaintiff has presented a *prima facie* case. With respect to plaintiff's burden of proving that the District's proffered reason for terminating his employment was pretextual, the Court concludes that plaintiff has not adduced evidence sufficient for a reasonable jury to so find.

The District has offered a legitimate, nondiscriminatory reason for firing plaintiff: plaintiff's inappropriate statements to students. In support of his argument that the District's nondiscriminatory reason was pretextual, plaintiff makes two arguments. First, plaintiff argues

9

that, at their depositions, Director of Human Resources Wendi Vargas and Superintendent Janet Samuels denied knowledge of plaintiff's disability despite documents in the District's files showing plaintiff was disabled.  Pl.'s Resp. 14.  In support, plaintiff cites deposition testimony where Vargas and Samuels state that they either do not remember or did not know that plaintiff was disabled, despite plaintiff's counseling in 2005, hospitalization in 2007 and 2008, and requests for disability leave.  *See*, *e.g.*, Vargas Dep. at 35:24-25, 5/9/13, ECF No. 19-29 ("I don't recall seeing and reading this form in depth."); Samuels Dep. 14:18-19, 3/15/13, ECF No. 19-31 ("I don't recall him saying [he was] suffering from depression.").  Plaintiff argues this testimony raises a genuine issue of material fact regarding the District's knowledge of Plaintiff's disability.  *See* Pl.'s Resp. 19.

Knowledge of plaintiff's disability, however, does not in any way suggest that the allegations of inappropriate comments to students were a fabrication or that discrimination was more likely than not a motivating or determinative cause of his firing.  "[The ADA] does not prevent an employer from discharging an employee for misconduct, even if that misconduct is related to a disability."  *Fullman v. Henderson*, 146 F.Supp. 2d 688 (E.D. Pa. 2001); *see also Hamilton v. Sw. Bell Tel. Co.*, 136 F.3d 1047, 1052 (5th Cir. 1998) ("Although Hamilton argues that the incident was caused by his [post-traumatic stress disorder], we are persuaded that the ADA does not insulate emotional or violent outbursts blamed on an impairment.").  Accordingly, even accepting plaintiff's argument that the District knew of plaintiff's disability and that the District knew plaintiff's conduct was related to his disability, plaintiff's evidence is insufficient to show discrimination under the ADA.

Second, plaintiff argues that the District "built the case for his termination" rather than helping him. Pl.'s Resp. 14, 22.  In support of his argument, plaintiff points to his letter of

10

January 6, 2009, which states, "[W]hen my professional character is attacked, to the witch-hunt intent that has taken place, then I must speak." Pl.'s Resp. Ex. 26.  When asked at his deposition what he meant by this statement, plaintiff responded, "I believe that what they were doing, they were calling a multiple amount of kids in to get their response of what's happening in the classroom besides just the allegations. . . . And I'm saying that it seemed like it was [a] witch hunt.  They were just looking for things to pin against me."  Willis Dep. at 24:21-26:13, 4/18/13, ECF No. 19-32.  Plaintiff testified that this was his only objection to the way the school handled the investigation.  *Id.* at 27:11.

Again, examining the evidence in the light most favorable to plaintiff, and resolving all reasonable inferences in plaintiff's favor, plaintiff's evidence does not raise a genuine issue of material fact.  No reasonable fact-finder could find that, because the District interviewed students beyond those who had made allegations, the reasons for plaintiff's discharge were a fabrication or that discrimination was more likely than not the motivating or determinative cause of plaintiff's termination.  Plaintiff's contention that the District was "just looking for things to pin against [him]," is a "bare assertion[]," and is insufficient to raise a genuine issue of material fact.  *Fireman's Ins. Co.*, 676 F.2d at 969.  Accordingly, the Court grants defendant's Motion for Summary Judgment on plaintiff's disparate-treatment claim.

### B. Failure-to-Accommodate Claim

Plaintiff also claims the District is liable for failing to accommodate his disability.  To state a failure-to-accommodate claim under the ADA, an employee must show that "(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination."

*Gaul*, 134 F.3d at 580.[11]  In the context of the ADA, an adverse employment action includes an employer's failure to make "reasonable efforts to assist the employee and to communicate with the employee in good faith, under what has been termed a duty to engage in the interactive process."  *Williams v. Phil. Hous. Auth. Police Dep't*, 380 F.3d 751, 761 (3d Cir. 2004) (citation omitted) (internal quotation marks omitted).

Plaintiff argues that the District failed to engage in the interactive process to provide him a reasonable accommodation.  A failure to engage in the interactive process, however, satisfies only the third element of plaintiff's failure-to-accommodate claim.  Plaintiff must still establish the second element: that he was qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer.  *Id.* at 772.

       i.      *Was Plaintiff a Qualified Individual?*

An employee is a qualified individual if he (1) "has the requisite skill, experience, education and other job-related requirements" and (2) "with or without reasonable accommodation, can perform the essential functions of that position."  *Turner v. Hershey Chocolate U.S.*, 440 F.3d 604, 612 (3d Cir. 2006) (citing 29 C.F.R. § 1630.2(n)).  Defendant disputes the latter requirement, arguing that plaintiff has not produced evidence showing that he could perform the essential functions of a teacher with or without a reasonable accommodation.  "[T]he plaintiff bears the burden of proving that she is otherwise qualified; if an accommodation is needed, the plaintiff must show, as part of her burden of persuasion, that an effective accommodation exists that would render her otherwise qualified."  *Walton v. Mental Health Ass'n. of Se. Pennsylvania*, 168 F.3d 661, 670 (3d Cir. 1999) (citation omitted).  To establish that

---

[11] Because the Court finds that defendant's Motion can be resolved on other grounds, the Court assumes for the purposes of the instant Motion that plaintiff was disabled with major depression within the meaning of the ADA.

an accommodation is reasonable, plaintiff bears the burden of showing that the accommodation's cost does not "clearly exceed" its benefit. *Id.* "These two requirements placed on the plaintiff will permit district courts to grant summary judgments for defendants in cases in which the plaintiff's proposal is either clearly ineffective or outlandishly costly." *Id.*

There is no dispute between the parties that "controlling student behavior through acceptable methods" is an "essential function" of a teacher. Def.'s Mot. Summ. J. 14. Rather, the parties dispute whether plaintiff has identified an effective, reasonable accommodation which would render plaintiff able to perform the essential functions of a teacher. Plaintiff argues that a three day overlap with his class's current substitute teacher, the accommodation recommended by Dr. Patel in plaintiff's return-to-work release, would have rendered him qualified to return to work in January 2009. Pl.'s Resp. 21.

The Court rejects this argument. First, plaintiff himself estimated that he would have needed overlap support for "maybe a month," not three days. Willis Dep. at 54:13, 4/18/13, ECF No. 19-32. Second, even assuming *arguendo* that a three day overlap would have been effective, such an accommodation would have required the District to excuse plaintiff's previous misconduct and allow plaintiff back into the classroom.[12] The ADA, however, does not require that an employer excuse an employee's previous misconduct, even if it was precipitated by his or her disability. *See Davila v. Qwest Corp.*, 113 F. App'x 849, 854 (10th Cir. 2004) ("[A]s many cases have recognized in various contexts, excusing workplace misconduct to provide a fresh start/second chance to an employee whose disability could be offered as an after-the-fact excuse is not a required accommodation under the ADA."); *Palmer v. Circuit Court of Cook Cnty., Ill.*, 117 F.3d 351, 352 (7th Cir. 1997) ("[I]f an employer fires an employee because of the

---

[12] As plaintiff himself writes in his Complaint, he requested the "accommodation of *returning to work* with the overlap support of the substitute teacher." Pl.'s Compl. II.F. (emphasis added).

13

employee's unacceptable behavior, the fact that that behavior was precipitated by a mental illness does not present an issue under the Americans with Disabilities Act."); *Jones v. Nationwide Life Ins. Co.*, 696 F.3d 78, 90 (1st Cir. 2012) ("When an employee requests an accommodation for the first time only after it becomes clear that an adverse employment action is imminent, such a request can be too little, too late.") (internal quotation marks omitted); *Heard v. St. Luke's Hosp.*, No. 08-cv-5494, 2009 WL 3081513, at *5 (E.D. Pa. Sept. 28, 2009) ("[A]n employer is not obligated to accommodate an employee whom it has decided to discharge for misconduct, even if the employee subsequently cites some medical condition or disability as the supposed cause of the prior misconduct triggering the discharge.")

In this case, the District fired plaintiff for misconduct occurring no later than April 2008, well prior to his December 2008 request for a three day overlap as an accommodation.[13] The District was unwilling to forgive plaintiff's previous misconduct and fired him as a result. *See, e.g.*, Pl.'s Resp. Ex. 25 (recommending that plaintiff be fired due to plaintiff's "egregious behavior and unprofessional interactions with students"). Under these circumstances, the ADA did not require the District to excuse plaintiff's past infractions and permit plaintiff to return to teaching.

      ii.      *Did the District Violate its Duty to Engage in the Interactive Process?*

Plaintiff identifies two requests that occurred *before* the conduct that resulted in his firing: (1) his March 17, 2005 request for a mentor and to tape record his classes, and (2) his January 31, 2008 request for "some assistance" because "a lot of [his] students this trimester are needy and seek attention." Def.'s Mot. for Summ. J. Ex. 2; Def.'s Mot. for Summ. J. Ex. 6.

---

[13] The Court notes that plaintiff has adduced no evidence that his request for a three day overlap with a substitute teacher was ever communicated to the District. Plaintiff's evidence demonstrates only that his insurance provider, Madison National, received the request. Def.'s Material Facts ¶ 62.

Plaintiff argues these requests triggered the District's duty to engage in an interactive process to identify and provide a reasonable accommodation.

To show that an employer violated its duty to engage in the interactive process under the ADA, an employee must show:

> 1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonable accommodated but for the employer's lack of good faith.

*Conneen v. MBNA Am. Bank, N.A.,* 334 F.3d 318, 331 (3d Cir. 2003). Plaintiff's argument on this issue is rejected because plaintiff has failed to establish (1) that the District knew about his disability at the time of his March 17, 2005 request for a mentor and to tape record his classes, and (2) that his January 31, 2008 request for "some assistance" because "a lot of [his] students this trimester are needy and seek attention," was a request for accommodations for his disability.

Plaintiff's March 2005 request for a mentor and to tape record his classes fails because at that time the District did not know of plaintiff's disability. At that time, all the District knew was that plaintiff had made inappropriate comments to students, as a result of which the District mandated that plaintiff undergo professional counseling. Based on the evidence presented, no reasonable jury could find that the District was aware that plaintiff had a disability at this point.

Plaintiff's January 31, 2008 request for "some assistance" because "a lot of [his] students this trimester are needy and seek attention" fails because his statement does not amount to a request for an accommodation *for his disability*. Although no "magic words" are necessary, an employee "must make clear that the [he/she] wants assistance for his or her disability" in order to trigger an employer's duty to engage in the interactive process. *Conneen,* 334 F.3d at 332 (internal quotation marks omitted). "What information the employee's initial notice must include depends on what the employer knows." *Phoenixville Sch. Dist.*, 184 F.3d at 313.

*Compare id.* (concluding duty to engage in interactive process triggered where employee became psychotic at work such that the employer was "so disturbed by [plaintiff's] behavior that [the employer] doubted her capacity to leave on a train by herself," employee informed her employer that she was subsequently hospitalized and being monitored for blood lithium levels, and where employee's son stated she would require "accommodations" upon her return to work), *with Taylor v. Principal Fin. Grp., Inc.*, 93 F.3d 155, 164 (5th Cir. 1996) (concluding duty to engage in the interactive process not triggered where employee told employer he was diagnosed with bipolar disorder, told employer he was "all right," and where employee requested a reduction in his "objectives," and a lessening of the "pressure").

In this case, plaintiff told the District in a disciplinary hearing on January 24, 2008 — just one week before plaintiff's request for assistance — that he had been off his medications during the alleged misconduct but was now on his medications. In context, it is clear that plaintiff did so in order to *assure* the District that he was no longer going to be making inappropriate comments. *See* Def.'s Mot. for Summ. J. Ex. 5 ("At the conclusion of the conference . . . [Plaintiff] stated that [he] stopped seeing [his] therapist and taking prescribed medications. [He] stated that [he is] now taking two different medications to help [him] with [his] nerves and to be able to cope with stress."). Furthermore, when plaintiff requested assistance on January 31, 2008, he stated that it was because "a lot of [his] students this trimester are needy and seek attention," not because of his disability. *Id.* at Ex. 6. Given these circumstances, no reasonable jury could find that plaintiff made clear that he wanted assistance for his disability.[14] *Cf. Coneen*, 334 F.3d at 324 (finding employee did not request accommodation where employee,

---

[14] The fact that Holler responded to plaintiff's request for assistance with his needy students by offering to help plaintiff conduct visits with other teachers who had the same students is further evidence that the District understood plaintiff as requesting assistance due to the needs of his students, not his medical inability to manage them.

16

after repeated warnings and chances to explain her tardiness to work, "refrained from suggesting a link between her medication and her tardiness" but instead cited non-medical reasons).

Plaintiff did not trigger the interactive process prior to the conduct resulting in his termination, and the District was not required to excuse plaintiff's previous misconduct upon his return to work in January 2009. Thus, plaintiff has failed to raise a genuine dispute of material fact on his failure-to-accommodate claim and the Court grants defendant's Motion for Summary Judgment as to this claim.

## V.   CONCLUSION

For the foregoing reasons, the Court grants defendant's Motion for Summary Judgment. An appropriate order follows.